**SEALED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

UNITED STATES OF AMERICA ex rel.,
LAUREN LAU

               Plaintiff/Relator,

v.

ELLWOOD MEDICAL CENTER, LLC;
AMERICORE HEALTH, LLC;
SONORAN DESERT PATHOLOGY
ASSOCIATES, LLC, dba VERIFY HEALTH;
FIRST CHOICE LABS USA;
DCMI, LLC; GRANT WHITE; MICHAEL
LEWITT; and DANIEL M. HURT.

               Defendants.

_____/

FILED BY ___ABM___ D.C.

**Sep 22, 2022**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FTL

**RELATOR'S AMENDED COMPLAINT**

      COMES NOW, UNITED STATES OF AMERICA ex rel. LAUREN LAU and hereby

submit the following Amended Complaint under seal in accordance with the requirements of the

Federal False Claims Act, 31 U.S.C. §3730(b)(2).

**I.**      **Introduction and Summary of Allegations**

      1.      Medicare beneficiaries across the country are being bombarded with information

about the benefits of genetic testing and pre-cancer screening tests.  Genetic testing (also known

as DNA testing) can provide valuable information about a person's genes and chromosomes that

physicians and providers may use to treat their patients.  Genetic testing ranges from newborn

screening to drug-gene testing or pharmacogenetics.  During the last several years, senior citizens

and Medicare beneficiaries are increasingly being confronted by scammers who promise free

testing for pre-cancer genetic testing.  This type of testing has created enormous profits for

1

marketing groups, laboratories, and physicians who have conspired to manipulate Medicare rules and guidelines.  The problem has grown so severe that the U.S. Department of Health and Human Services Office of Inspector General ("HHS-OIG") has issued several fraud alerts and has set up a public hotline to report suspected fraud.  Genetic and pre-cancer testing can be very expensive with Medicare reimbursing laboratories thousands of dollars for clinical tests per patient. Additionally, senior citizens are also at risk as they are financially responsible for any services that were denied by Medicare.

2.      Ellwood Medical Center, LLC (hereinafter "Defendant Ellwood"), a rural, community-based hospital conspired with multiple laboratories in an illegal referral and kickback scheme that resulted in fraudulent submissions to Medicare for genetic testing and violations of the federal Anti-Kickback Statute ("AKS").  Defendant Ellwood received a high volume of physician requests for pre-cancer genetic laboratory testing that were faxed to Defendant Ellwood. Defendant Ellwood advertised that they were a CLIA approved clinical laboratory but did not have a functioning laboratory on sight to perform pre-cancer screening.[1]  Defendant Ellwood conspired with Sonoran Desert Pathology Associates, LLC, dba Verify Health, First Choice Labs USA and upon information and belief, DCMI, LLC (hereinafter "Defendant Laboratories"), to fraudulently bill Medicare for services.

3.      Defendant Ellwood was purchased by Defendant Americore Health, LLC (hereinafter "Defendant Americore") in 2017.  According to its website, the founder and owner, Grant White, is "a former investment banker who is focused on new revenue streams and profitability for the hospitals they own."  Defendant Laboratories all share the same office address

---

[1] CLIA is short for Clinical Laboratory Improvement Amendments and is required for laboratories that accept human specimens for the purpose of performing laboratory examinations or procedures.

in Fort Lauderdale, Florida and along with Defendant Ellwood have formed a conspiracy to fraudulently bill Medicare in a scheme that has resulted in huge profits.

4.     This scheme is not a new one, nor unique, and very simply involves Defendant Ellwood and Defendant Laboratories (collectively "Defendants") filing claims for genetic and pre-cancer testing with Medicare using Defendant Ellwood's National Provider Identifier ("NPI") number to fraudulently bill Medicare.[2]  This illegal referral relationship was designed to create massive profits for Defendants at the expense of taxpayers and Medicare.  Defendant Ellwood performed little or no pre-cancer screening and used its status as a rural community hospital to violate Medicare's 70/30 rule for laboratory billing.

5.     Relator became aware of this scheme while working as a consultant for Defendant Ellwood and Defendant Americore.  She learned, first-hand, that Defendant Laboratories were billing genetic and pre-cancer tests as if Defendant Ellwood had conducted the tests.  Defendant Ellwood did not receive patient samples for testing, had no machines to process patient samples, and did not employ a pathologist to read the results.  This Amended Complaint contains only a fraction of the information that Relator possess.

## II.     Parties

### A.  Relator

6.     Under the FCA, a person with knowledge of false or fraudulent claims against the government (a "relator") may bring an action on behalf of the government and themselves.

7.     **Lauren Lau** is a resident of Cranberry Township, Pennsylvania.  Ms. Lau earned a Bachelor of Arts degree in History and Education in 2007 and obtained her master's degree in Information Technology in 2010.

---

[2] An NPI is a unique 10-digit identification number issued to health care providers by the Centers for Medicare and Medicaid Services and is used to bill for medical services and procedures.

8.      Ms. Lau was hired in April 2019 by Infallibill to work as a contractor/consultant to Ellwood City Medical Center to assist them with their credentialing and payor contracting.  Ms. Lau has more than 18 years' experience in directing and operating a medical billing, coding, and credentialing company.  She was the Chief Operations Engineer for Infallibill and among other things, was responsible for credentialing for large hospitals and physician practices.

**B. Defendants**

9.      **Ellwood Medical Center, LLC,** is a rural, community hospital located at 724 Pershing Street, Ellwood City, Pennsylvania 16117.

10.     **Americore Health, LLC,** maintains an office at 4337 Sea Grape Drive, Lauderdale-by-the-Sea, Florida 33308, telephone number (954) 546-0886.  Americore Health, LLC acquired Ellwood Medical Center, LLC in April 2017.

11.     According to their website, Americore Health, LLC describes itself this way:

"*is a new healthcare company focused on saving and revitalizing rural communities through the acquisition and management of rural hospitals across the United States.*"

12.     **Sonoran Desert Pathology Associates, LLC, dba Verify Health,** maintains a corporate office, per the California Secretary of State, at 81715 Doctor Carreon Blvd., Suite A2, Indio, California 92201.  The President and CEO is listed as Dan Hurt. Verify Health maintains an office at 6061 NE 14th Avenue, Fort Lauderdale, Florida 33334.

13.     **First Choice Labs USA,** maintains an office at 6061 NE 14th Avenue, Fort Lauderdale, Florida 33334, the same address where Verify Health maintains an office.

14.   **DCMI, LLC,** maintains an office, per the State of Florida Secretary of State, at 6061 NE 14th Avenue, Fort Lauderdale, Florida, 33334, the same address used by Verify Health and First Choice Labs. Daniel M. Hurt is listed as a manager.[3]

15.   **Grant White,** per Americore Health, LLC's website is:

> The Founder and CEO and is a "*former investment banker and entrepreneur with a proven track record of success across multiple sectors. Having grown up in rural Canada on military bases Mr. White has an affinity for rural communities. Seeing the distress in the US rural healthcare market, Mr. White developed a rural healthcare business model that is less dependent on the government and optimizes the inherent value of each hospital. Americore Health leverages Grant's diverse business background and connections across multiple healthcare and financial platforms to deliver new revenue and profitability to the hospitals. Mr. White has executed over $30 billion of transactions in his career and has built companies from scratch to average annual revenue growth exceeding 400% per annum.*"[4]

16.   **Michael Lewitt** is a major shareholder in Americore Health, LLC and a self-described senior leader.

17.   **Daniel M. Hurt** is listed as CEO/President of Sonoran Desert Pathology Associates, LLC, dba Verify Health with the California Secretary of State.  Additionally, Hurt is listed as a "Manager" with DCMI, LLC, which shares an address with Verify Health, LLC, and First Choice Labs USA.

### III.   Medicare Rules for Rural Hospitals

18.   The Centers for Medicare and Medicaid Services (CMS) has developed and implemented plans to improve access to high quality, affordable healthcare in rural communities. Their goal is to ensure that the nearly one in five individuals who live in rural communities have access to care that meets their needs.[5]  Hospitals like Defendant Ellwood would fall under this CMS plan.  CMS has specific guidelines for clinical diagnostic laboratory billing based on provider

---

[3] http://search.sunbiz.org/Inquiry/CorporationSearch/SearchResult
[4] https://americorehealth.com/management/
[5] https://www.gov/newsroom/fact-sheets/cms-rural-health-strategy

agreements for genetic and pre-cancer screening tests under the 70/30 rural rule. The Social

Security Act, Title 18 § 1833 states, in part:

> The Act provides that a referring laboratory may bill for clinical laboratory diagnostic tests on the clinical laboratory fee schedule for Medicare beneficiaries performed by a reference laboratory only if the referring laboratory meets certain conditions. Payment may be made to the referring laboratory but only if one of the following conditions is met:
>
> • the referring laboratory is located in, or is part of, a rural hospital;
> • the referring laboratory is wholly owned by the entity performing such test,
> • the referring laboratory wholly owns the entity performing such test, or both the referring laboratory and the entity performing such test are wholly owned by a third entity; or
> • the referring laboratory does not refer more than 30 percent of the clinical laboratory tests for which it receives requests for testing during the year (not counting referrals made under the wholly owned condition described above).

19.     In the case of a clinical laboratory test provided under an arrangement (as

defined in §1861(w)(1)) made by a hospital, CAH or SNF, payment is made to the hospital

or SNF.

> Examples of 30 Percent Exception:
>
> (1) A laboratory receives requests for 200 tests, performs 139 tests, and refers 61 tests to a nonrelated laboratory. All tests referred to a non-related laboratory are counted. Thus, 30.5 percent (61/200) of the tests are considered tests referred to a non-related laboratory and, since this exceeds the 30 percent standard, the referring laboratory may not bill for any Medicare beneficiary laboratory tests referred to a non-related laboratory.
>
> (2) A laboratory receives requests for 200 tests, performs 139 tests and refers 15 to a related laboratory and 46 to a non-related laboratory. Only 23 percent of the tests were referred to nonrelated laboratories. Since this is less than 30 percent, the referring laboratory may bill for all tests. If it is later found that a referring laboratory does not, in fact, meet an exception criterion, the A/B MAC (B) should recoup payment for the referred tests improperly billed. The RO shall take whatever action is necessary to correct the problem.

20.     Guidance on the 70/30 rural rule can also be found at 42 U.S.C. § 13951. It states,

in part:

*"In the case of a bill or request for payment for a clinical diagnostic laboratory test for which payment may otherwise be made under this part [42 USCS §§ 1395j et seq.] on an assignment-related basis or under a provider agreement under section 1866 [42 USCS § 1395cc], payment may be made only to the person or entity which performed or supervised the performance of such test; except that*

(i)     *if a physician performed or supervised the performance of such test, payment may be made to another physician with whom he shares his practice.*

(ii)    *in the case of a test performed at the request of a laboratory by another laboratory, payment may be made to the referring laboratory but only if—*

(I)     *the referring laboratory is located in, or is part of, a rural hospital,*

(II)    *the referring laboratory is wholly owned by the entity performing such test, the referring laboratory wholly owns the entity performing such test, or both the referring laboratory and the entity performing such test are wholly owned by a third entity, or*

(III)   *not more than 30% of the clinical diagnostic laboratory tests for which such referring laboratory (but not including a laboratory described in subclause (II) [,] receives requests for testing during the year in which the test is performed[,] are performed by another laboratory."*

These regulations were set in place to ease the burden on rural hospitals. At the time, the rule and exemptions were thought of to keep community hospitals afloat and build revenue, otherwise these rural hospitals would quite possibly need to close.

## IV.    The Nature of the Case

21.     In March 2019, Sheldon Michael Kane, CEO of Infallibill, contacted Relator Lau and interviewed her for a position at his company. In April 2019, Relator Lau was hired to handle credentialing and payor contracting for Defendant Ellwood. Defendant Ellwood had recently been purchased by Defendant Americore and its CEO Grant White. Because of the new ownership, the Employer Identification Number (commonly known as EIN) had changed, and Relator Lau was

instructed to ensure that the facility and providers were identified properly through the EIN to be in-network with all insurance plans across Western Pennsylvania.[6]

22.     As part of her job, Relator Lau would review insurance payor contracts. As she reviewed the contracts, employees began asking her how to contract with DNA testing laboratories who perform cancer screening. Through office emails she received and conversations with an individual who was purportedly the hospital lab director Carolyn Chen, MD, several finance department employees, and others, she learned that Defendant Ellwood was billing for DNA testing that was never performed by Defendant Ellwood. Relator Lau reviewed a spreadsheet maintained by Defendant Ellwood CEO Beverly Annarumo that revealed that Defendant First Choice was submitting fraudulent bills to Medicare for genetic and pre-screening laboratory services using Defendant Ellwood's NPI number in amounts totalling approximately $2 - $3 million per week beginning in March 2019 and continuing through June 2019. CEO Annarumo kept track of electronic Medicare payments that were received by Defendant Ellwood and would send the report to Defendant First Choice, Defendant Verify, and CEO Hurt, who is also listed as manager for Defendant First Choice Labs. Defendant Hurt would then contact CEO Annarumo with an amount due to Defendant First Choice Labs.

23.     Relator Lau calculated that Defendant Ellwood was keeping around 15-18% of the funds that came in each week from Medicare and sending the rest to Defendants Hurt and First Choice Labs. Relator Lau believes that the majority, if not all, of the genetic and pre-cancer testing that was billed by Defendants using Defendant Ellwood's NPI number were for patients who never visited the hospital or lived in the state of Pennsylvania.

---

[6] An EIN is also known as a Federal Tax Identification Number.

24.     After uncovering this scheme, Relator Lau contacted her employer, Mr. Kane, and told him what she had uncovered. Mr. Kane requested that Relator Lau double check the information before making any decisions. Mr. Kane told Relator Lau that he had notified Defendant Americore's CEO Grant White and major shareholder Michael Lewitt of the fraudulent activity who promised to investigate it. Relator was then told by Mr. Kane that he had not received a response from CEO White and after confirming with Relator Lau that what she had uncovered was fraudulent, Infallibill discontinued working for Defendant Americore.

## V.     Patient Examples of Fraudulent Medicare Billing

25.     Relator Lau obtained a 50-page Explanation of Benefits ("EOB") file in mid-2019 from Defendant Hurt who had emailed it to her and the rest of the billing/finance department to determine what was happening with duplicate claims.  The EOB demonstrates that Defendants Hurt and First Choice Labs were keeping track of all billings to Medicare and had a first-hand role in billing Medicare for genetic and pre-cancer testing using Defendant Ellwood's NPI number. The following are a sample of patients that had their Medicare benefits billed by Defendants Hurt and First Choice Labs, as well as other named Defendants.  These arrangements are illegal referrals resulting in a false claim being submitted to the government for payment and a violation of the Anti-Kickback Statute.  This is not intended to limit the scope of the fraud but rather provide a sampling of the fraudulent tests that were billed to Medicare and the amounts that were reimbursed by Medicare to Defendants.

### A.  Medicare Patient A

26.     Patient received genetic and pre-cancer screening tests on April 4, 2019.  A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist

to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $8,548.02 on July 25, 2019.

**B.  Medicare Patient B**

27.     Patient received genetic and pre-cancer screening tests on June 2, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

**C.  Medicare Patient C**

28.     Patient received genetic and pre-cancer screening tests on May 24, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

**D.  Medicare Patient D**

29.     Patient received genetic and pre-cancer screening tests on March 23, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

**E.  Medicare Patient E**

30.     Patient received genetic and pre-cancer screening tests on May 4, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work

was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $6,560.93 on July 25, 2019.

### F.  Medicare Patient F

31.    Patient received genetic and pre-cancer screening tests on May 21, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

### G.  Medicare Patient G

32.    Patient received genetic and pre-cancer screening tests on May 29, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $6,560.93 on July 25, 2019.

### H.  Medicare Patient H

33.    Patient received genetic and pre-cancer screening tests on May 19, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

**I.   Medicare Patient I**

34.     Patient received genetic and pre-cancer screening tests on March 4, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

**J.   Medicare Patient J**

35.     Patient received genetic and pre-cancer screening tests on May 29, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

**K.   Medicare Patient K**

36.     Patient received genetic and pre-cancer screening tests on June 3, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

**L.   Medicare Patient L**

37.     Patient received genetic and pre-cancer screening tests on May 29, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist

to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

### M. Medicare Patient M

38.    Patient received genetic and pre-cancer screening tests on April 29, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

### N.  Medicare Patient N

39.    Patient received genetic and pre-cancer screening tests on June 3, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

### O. Medicare Patient O

40.    Patient received genetic and pre-cancer screening tests on April 17, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

### P.  Medicare Patient P

41.    Patient received genetic and pre-cancer screening tests on May 22, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work

was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $5,724.38 on July 25, 2019.

**Q.  Medicare Patient Q**

42.     Patient received genetic and pre-cancer screening tests on May 1, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $9,385.72 on July 25, 2019.

**R.  Medicare Patient R**

43.     Patient received genetic and pre-cancer screening tests on March 28, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $9,385.72 on July 25, 2019.

**S.  Medicare Patient S**

44.     Patient received genetic and pre-cancer screening tests on June 3, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

### T.  Medicare Patient T

45.     Patient received genetic and pre-cancer screening tests on May 28, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $6,560.93 on July 25, 2019.

### U.  Medicare Patient U

46.     Patient received genetic and pre-cancer screening tests on May 28, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

### V.   Medicare Patient V

47.     Patient received genetic and pre-cancer screening tests on May 28, 2019.   A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to perform the service.  A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $6,560.93 on July 25, 2019.

### W. Medicare Patient W

48.   Patient received genetic and pre-cancer screening tests on May 28, 2019.  A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood.  Defendant Ellwood did not have a laboratory or pathologist to

perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,129.30 on July 25, 2019.

### X. Medicare Patient X

49.     Patient received genetic and pre-cancer screening tests on May 30, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $8,258.87 on July 25, 2019.

### Y. Medicare Patient Y

50.     Patient received genetic and pre-cancer screening tests on May 22, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $6,560.93 on July 25, 2019.

### Z. Medicare Patient Z

51.     Patient received genetic and pre-cancer screening tests on April 27, 2019. A Defendant Laboratory performed the services yet submitted the billing to Medicare as if the work was performed by Defendant Ellwood. Defendant Ellwood did not have a laboratory or pathologist to perform the service. A Novitas Solution Medicare remittance advice for this patient shows that Defendants were reimbursed $7,398.63 on July 25, 2019.

## VI.    Damages

52.     Relator provided Medicare billing and reimbursement data for 25 patient examples found in this Complaint that total nearly $190,000. The services provided on these examples all

related to genetic testing for Medicare patients and were performed between March 2019 and June 2019. Relator has Medicare data for an additional 25 patients totaling about the same for a total amount of $380,000 in fraudulent billing. The reimbursements for the 50 patients were received on or about July 25, 2019.

53.     Relator has provided copies of email exchanges between Defendant Laboratories discussing incoming funds from Medicare and corrections and edits required by Medicare to release the funds to Defendant Ellwood. In an email exchange between employees of Defendant First Choice and Defendant Americore, corrections have been made on 12 Medicare billing accounts that would result in Defendant Ellwood receiving $187,450.

54.     In an email dated April 11, 2019, that was provided to Relator Lau by Mr. Kane, Defendant Americore investor Michael Lewitt emailed Mr. Kane inquiring about gross and net amounts due on laboratory services totaling more than $594,201. The remittance date for the 12 entries were dated from April 3, 2019, through April 18, 2019.

55.     When the Medicare data that was provided by the Relator is combined with the emails, the total dollars that Defendants have received or will receive totals more than $3.1 million. Relator's employment with Defendant Ellwood ended in approximately six months. In that time, at least $3.1 in fraud was uncovered by the Relator. A thorough review of Medicare billings for genetic testing performed by Defendant Laboratories and billed by Defendant Ellwood for 2018 and 2019 would uncover potentially tens of millions of dollars taken by fraud.

**VII.    The False Claims Act**

56.     The FCAs, as amended, provide in pertinent part that:

[A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or

statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

57.    The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).  No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## VIII.    The Federal Anti-Kickback Statute

58.    The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits knowingly and willfully giving or receiving any payment—directly or indirectly, overtly or covertly, in cash or in kind—to induce or reward the referral or generation of federal health care business.  The AKS prohibits the offer or payment of "anything of value" in return for referrals.  A "thing of value" is defined broadly to include payment in kind.  The AKS extends equally to the solicitation or acceptance of payments and to offers to pay and to actual payments for referrals.  Under the AKS both criminal and civil penalties apply, including civil monetary penalties, and the sanction of exclusion from federal health benefit programs.

59.    The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization, affect medical judgment, and restrict competition, ultimately resulting in poor quality of care being delivered to patients.  In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Medicare any claim for referrals that are *induced* by

kickbacks.  As amended by the Patient Protection and Affordable Care Act of 2010 ("ACA"), Pub.

L. No. 111-148, § 6402(f), the AKS now provides that "a claim that includes items or services

resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the

False Claims Act]." 42 U.S.C. § 1320a-7b(g).

60.     According to the ACA's legislative history, this amendment to the AKS was

intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for

the purpose of civil actions under the False Claims Act, even when the claims are not submitted

directly by the wrongdoers themselves." 155 Cong. Rec. S10854.  To the extent the Government

would not have paid the claims had it known the truth about the kickback arrangement, the

Government is damaged in the full amount that it paid on those false claims.

## IX.     Conditions of Participation and Conditions of Payment

61.     To participate in the Medicare Program, a health care provider must also file a

provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc.  The provider agreement

requires compliance with certain requirements that the Secretary deems necessary for participating

in the Medicare Program and for receiving reimbursement from Medicare.

### A.  Medical Necessity and Appropriateness Requirements

62.     One such important requirement for participating in the Medicare Program is that

for all claims submitted to Medicare, claims may be submitted only when medical goods and

services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate

information. 42 U.S.C. § 1395y(a)(1)(A), (B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

63.     Various claims forms, including but not limited to the Health Insurance Claim

Form, require that the provider certify that the medical care or services rendered were medically

"required," medically indicated and necessary and that the provider is in compliance with all

applicable Medicare laws and regulations.  42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406.  Providers must also certify that the information submitted is correct and supported by documentation and treatment records.  Id.; see also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

64.     The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

**B.  Obligation to Refund Overpayments**

65.     As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports).  42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31.  In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony.  Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments.  42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

66.     Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due, and a debt is created in favor of CMS.  42 U.S.C. § 1395u(l)(3).  In such cases, the overpayment is subject to recoupment.  42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments.  42 U.S.C. § 1395l(j).

**X.     Other Federally Funded Health Care Programs**

67.     Although false claims to Medicare are the primary FCA violations at issue in this case, the patients who were subjected to the medically unnecessary procedures that are the subject of this action may have been beneficiaries of one of three federally-funded health care benefit

programs – Medicare, Medicaid, or TRICARE.  Accordingly, those other two programs are briefly discussed as well.

68.     The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals.  CMS administers Medicaid on the federal level while the individual states administer the program on the state level.  Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare.  As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

69.     TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active-duty service members, retired service members, and their dependents.  Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, *et seq*.).  Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i).  And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care and failing to maintain adequate medical records.  32 C.F.R. §§ 199.9(b)(3)(b)(5).

## XI.   CLAIMS FOR RELIEF

### COUNT I
### False Claims Act: Presentation of False Claims
### 31  U.S.C. § 3729(a)(1) and 31 U.S.C. § 3729(a)(1)(A)

70.     Relators repeat and incorporate by reference the allegations contained in paragraphs 1-69 of this Complaint as if fully set forth herein.

71.     Defendants knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval to the United States for genetic testing based on illegal referrals and a kickback scheme that resulted in fraudulent submissions to Medicare and violations of the federal Anti-Kickback Statute.

72.     Defendants knowingly presented, and caused to be presented, false or fraudulent claims for payment or approval to the United States by submitting claims to Medicare and other government payors for genetic testing based on illegal referrals and a kickback scheme that resulted in fraudulent submissions to Medicare and violations of the federal Anti-Kickback Statute.

73.     Defendants violated the AKS when Defendant Laboratories (collectively "Defendants") used Defendants Ellwood to fraudulently file claims for genetic and pre-cancer testing with Medicare using Defendant Ellwood's National Provider Identifier (NPI) number to bill Medicare.  This illegal referral relationship was designed to create massive profits for Defendants at the expense of taxpayers and Medicare.  Defendant Ellwood performed little or no pre-cancer screening and used its status as a rural community hospital to violate Medicare's 70/30 rule for laboratory billing.

74.     Thus, Defendants knowingly presented, and caused to be presented, false or fraudulent cost reports claiming payment for claims submitted in furtherance of the kickback scheme and in violation of the AKS.

75.     By virtue of the false or fraudulent claims that Defendants made and/or caused to be made, the United States suffered damages and is therefore entitled to treble damages under the FCA, to be determined at trial, plus civil penalties of not less than $11,181 and up to $22,363 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. §3729, *et seq*.

## COUNT II
### False Claims Act: Presentation of False Statements
### Material to False Claims (31 U.S.C. § 3729(a)(1)(B))

76.     Relators repeat and incorporate by reference the allegations contained in paragraphs 1-69 of this Complaint as if fully set forth herein.

77.     Defendants knowingly made, used, or caused to be made or used false statements material to false or fraudulent claims and to get such claims paid by the United States with respect to genetic testing based on illegal referrals and a kickback scheme that resulted in fraudulent submissions to Medicare and violations of the federal Anti-Kickback Statute.

78.     This conduct created FCA liability in that each claim for payment submitted or caused to be submitted by the Defendants to government healthcare programs was accompanied by an express or implied certification that the transaction was not in violation of federal or state statutes, regulations, or program rules.  Each of those certifications was false, because each claim for payment was tainted by the kickback arrangements.  Thus, each claim to Medicare or other government payor from the Defendants constituted a violation of the FCA.

79.     Additionally, Defendants knowingly made, used, or caused to be made or used false statements to conceal the kickback scheme and prohibited financial relationship that existed.

80.     Said false statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

## COUNT III
### False Claims Act: False Record Material to Obligation to Pay
### (31 U.S.C. § 3729(a)(1)(G))

81.     Relators repeat and incorporate by reference the allegations contained in paragraphs 1-69 of this Complaint as if fully set forth herein.

82.     Defendants made and used or caused to be made or used false records or statements material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.  They submitted records falsely certifying their compliance with the Medicare and AKS laws when they submitted claims for payment.

83.     Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether they were false.

## COUNT IV
### False Claims Act: Conspiracy to Submit False Claims
### (31 U.S.C. § 3729(a)(1)(C))

84.     Relators repeat and incorporate by reference the allegations contained in paragraphs 1-69 of this Complaint as if fully set forth herein.

85.     Defendants entered into illegal agreements to defraud the United States by filing claims for genetic and pre-cancer testing with Medicare using Defendant Ellwood's National Provider Identifier (NPI) number to fraudulently bill Medicare. This illegal referral relationship was designed to create massive profits for Defendants at the expense of taxpayers and Medicare, in violation of 31 U.S.C. § 3729(a)(1)(C) (2012).

86.     Said scheme was mutually beneficial, as Defendant Ellwood benefitted financially for the referrals of physician requests for pre-cancer genetic laboratory testing that were faxed to Defendant Ellwood but did not, and could not, perform tests.  Defendants Laboratories, and their

24

leadership named of Defendants, benefitted by using Defendant Ellwood's NPI number to fraudulently bill Medicare. This illegal referral relationship was designed to create massive profits for Defendants at the expense of taxpayers and Medicare.

87.     By virtue of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, plus a civil penalty for each claim of not less than $11,181 and not more than $22,363 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. §3729, *et seq*.

## XII.  PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States of America demands judgment against the Defendants, ordering that:

**As to the Federal Claims:**

a.  That Defendants cease and desist from violating 31 U.S.C. §3729 *et seq*.

b.  That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States government has sustained because of Defendants' actions, plus a maximum civil penalty for each false claim, together with the costs of this action, with interest, including the cost to the United States government for its expenses related to this action.

c.  That this Court enters judgment against Defendants for the maximum amount of actual damages under 31 U.S.C. §3729 *et seq*.

d.  That Relators be awarded all costs incurred, including attorneys' fees.

e.  That the United States and Relators receive all relief, both in law and in equity, to which they are entitled.

**DEMAND FOR JURY TRIAL**

Dated this 22nd day of September 2022.

Respectfully submitted,
/s/ James D. Young

BY: _____
James D. Young (FBN 567507)
jyoung@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
76 S. Laura Street, Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone
(904)366-7677 Facsimile

Juan Martinez (FBN 1013923)
jmartinez@forthepeople.com
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, FL 33602
(813) 393-5463 Telephone

*Attorneys for Plaintiff/Relator*